Lloyd LAUDERDALE, Petitioner,

v.

STATE of Alaska, Respondent.

Donald James WARE, Petitioner,

v.

CITY OF ANCHORAGE, State of Alaska, et al., Respondent.

Doris F. SEAY, Petitioner,

v.

STATE of Alaska, Respondent.

Rocko B. FORDHAM, Petitioner,

v.

STATE of Alaska, Respondent.

No. 2761.

Supreme Court of Alaska.

March 30, 1976.

---

Suzanne C. Pestinger, Robert John Brady and Hugh G. Wade, Anchorage, for petitioners.

Ivan Lawner, Asst. Dist. Atty., Anchorage, Joseph D. Balfe, Richard Garnett, III, Anchorage, and Avrum M. Gross, Juneau, for respondents.

Suzanne C. Pestinger, Birch, Jermain, Horton & Bittner, Anchorage, for petitioner Lauderdale.

Robert John Brady and Hugh G. Wade, Anchorage, for petitioners Ware, Seay and Fordham.

Ivan Lawner, Asst. Dist. Atty., Joseph D. Balfe, Dist. Atty., Anchorage, and Avrum M. Gross, Atty. Gen., Juneau, for respondent State of Alaska.

Richard Garnett, III, City Atty., for respondent City of Anchorage.

## OPINION

Before BOOCHEVER, C. J., and CONNOR, ERWIN and BURKE, JJ., and DIMOND, J. Pro Tem.

DIMOND, Justice Pro Tem.

Lloyd Lauderdale has been charged with the offense of operating a motor vehicle while intoxicated. He submitted to a breathalyzer test in accordance with AS 28.35.031.[1] After entering a not guilty plea, Lauderdale filed a motion for discovery and inspection of the ampoule used in the breathalyzer test. The ampoule was not produced by the state. The district court ordered the results of the breathalyzer test suppressed, and upon review by the superior court, the order of the district court was reversed and the case remanded for trial.

Lauderdale seeks review of the suppression matter by this court. We have granted review because the case raises a controlling question of law as to which there is substantial ground for difference of opinion,[2] and a review at this time may materially advance the ultimate termination, not only of this litigation, but also of other pending litigation involving the same question. We believe the matter is of sufficient importance to justify deviation from the normal appellate procedure of permitting review only after entry of a final judgment.[3]

The breathalyzer test is described as follows:

The breathalyzer is a machine designed to measure the amount of alcohol in the alveolar breath and is based upon the principle that the ratio between the amount of alcohol in the blood and the amount in the alveolar breath from the lungs is a constant 2100 to 1. In other words, the machine analyzes a sample of breath to determine the alcoholic content of the blood. . . .

To operate the machine, the subject blows into the machine through a mouthpiece until he has emptied his lungs in one breath. The machine is so designed

---

1. AS 28.35.031 provides:
   A person who operates or drives a motor vehicle in this state shall be considered to have given consent to a chemical test or tests of his breath for the purpose of determining the alcoholic content of his blood if lawfully arrested for an offense arising out of acts alleged to have been committed while the person was operating or driving a motor vehicle while under the influence of intoxicating liquor. The test or tests shall be administered at the direction of a law enforcement officer who has reasonable grounds to believe that the person was operating or driving a motor vehicle in this state while under the influence of intoxicating liquor.

2. Appellate Rule 23(d). *Cf. People v. Hitch*, 12 Cal.3d 641, 117 Cal.Rptr. 9, 527 P.2d 361 (1974), with *State of New Jersey v. Teare*, 133 N.J.Super. 338, 336 A.2d 496; 135 N.J.Super. 19, 342 A.2d 556 (1975), and *State v. Superior Court*, 107 Ariz. 332, 487 P.2d 399 (1971).

3. Appellate Rule 23(d) and 24(a)(1). *Peter v. State*, 531 P.2d 1263, 1265 (Alaska 1975).

that it traps only the last 52½ cubic centimeters of air that has been blown into it. This air is then forced, by weight of a piston, through a test ampoule containing a solution of sulphuric acid and potassium dichromate. This test solution has a yellow hue to it. As the breath sample bubbles through the test solution, the sulphuric acid extracts the alcohol, if any, therefrom, and the potassium dichromate then changes the alcohol to acetic acid, thereby causing the solution to lose some of its original yellow color. The greater the alcoholic content of the breath sample, the greater will be the loss in color of the test solution. By causing a light to pass through the test ampoule and through a standard [reference] ampoule containing the same chemical solution as the test ampoule (but through which no breath sample has passed), the amount of the change in color can be measured by photoelectric cells which are connected to a galvanometer. By balancing the galvanometer, a reading can be obtained from a gauge which has been calibrated in terms of percentage of alcohol in the blood.[4]

Charles King, a medical technologist, testified at the suppression hearing. Since 1970, his job had been to test and certify the breathalyzer ampoules used in Alaska by law enforcement authorities. He was qualified as an expert witness in that field.

The district court found from such testimony that there was plausible evidence that could be derived from later testing of the test ampoule which could bear upon the propriety of the examination of the ampoule in the breathalyzer machine and which, in turn, would bear upon the guilt or innocence of the defendant. The superior court found the opposite—that the expert testimony did not meet the test of establishing that preservation and subsequent analysis of the ampoules would provide scientifically reliable data that would materially assist the petitioner's case.

■ We disagree with the superior court and hold that the district court was correct in its finding. The test and reference ampoules could be probative evidence of the propriety or impropriety of the breathalyzer test for several reasons. From the witness's testimony, it appeared that it was critical to the results of the test that precisely three milliliters of solution be contained in the ampoules; if the volume was less than three milliliters, the final result would be a falsely elevated level of alcohol. This would be true as to both the test and reference ampoules. After the test is given, the quantity of the solution in the reference ampoule can be accurately measured, and the test itself does not materially change the quantity of solution in the test ampoule, which can also be measured.

Each ampoule must contain .025 percent of potassium dichromate, which is critical to the test within a range of approximately a 33⅓ percent variance. The amount of potassium dichromate in the reference ampoule can be measured after the test has been given. This is not necessarily true as to the test ampoule. If the person taking the test had been drinking, there would be a chemical change in contents of the ampoule and the percentage of potassium dichromate originally present would be different. However, the witness did say that even in the test ampoule, it would be "probably possible" to measure the potassium dichromate, but that he did not know how to do it at the present time.

The character of the glass of the ampoule is also important. Any imperfections in the glass would cause diffusion of the light going through it, and this would tend to make the reading on the galvanometer incorrect. The same would be true if the glass ampoule were not the correct thickness, and this could be measured after the test had been given.

Apparently, at the present time, it is not possible to rerun a test and obtain accurate

---

4. *Wester v. State*, 528 P.2d 1179, 1180 (Alaska 1974), quoting from *State v. Baker*, 56 Wash.2d 846, 355 P.2d 806, 809 (1960).

results. There is the possibility, however, that further studies and improved techniques may be developed in the future which would provide some reliable data on a rerun of a test ampoule. But even now, the test of a used ampoule could be made again, and if the results were less than those originally obtained, the original results would be suspect. The reason for this is that the passage of time, with the chemical changes in the solution in the ampoule, would normally cause the test results to show an increase in blood alcohol.

In addition to the expert testimony of Charles King, there is another factor which has a bearing on the case. The regulations of the Department of Health and Social Services require that

> (a) 10 ampoules, selected at random from each ampoule lot, shall be chemically analyzed by an approved laboratory to verify the proper chemical composition and volume stated by the ampoule manufacturer.[5]

There is no indication in the regulations as to how many ampoules compose a "lot". In this case, the lot consisted of 10,000 ampoules, and according to requirements of the regulation, 10 of them were selected at random for testing. In other instances, a lot consists of only 100 ampoules, and again 10 are selected for analysis.

What this means is that in this case only one-tenth of one percent of the ampoules were tested, whereas in other cases, one percent will be analyzed. Thus, in a large lot of ampoules, such as we have here, the probabilities of not detecting defective ampoules are greater than in a smaller lot. The existence of this situation is an additional argument in favor of Lauderdale's contention that he should be permitted to check the specific ampoules used in his test.

Based upon the expert testimony of Charles King, the district court determined that plausible evidence from testing the

ampoules could be obtained which might have had some bearing on the guilt or innocence of Lauderdale, and that the state should produce them. When the prosecuting attorney stated that this was impossible, the district court ordered the breathalyzer test suppressed from evidence at the trial.

Criminal rule 16(b)(7) provides that:

> Upon a reasonable request showing materiality to the preparation of the defense, the court in its discretion may require disclosure to defense counsel of relevant material and information . . . .

We have discussed in some detail the expert testimony of Charles King. We are persuaded by this testimony that scientifically reliable data may well be obtained by examination and testing of the ampoules used in the test, which may have a material bearing on the ultimate question involved here, i. e., the alcoholic content of Lauderdale's blood at the time the test was administered. The discretion of the district court was properly exercised under the rule in requiring production of the ampoules.

■ The next question is whether the district court was correct in suppressing the results of the test. Lauderdale contends that this action was called for because the test and reference ampoules were material to guilt or innocence with regard to the crime with which he was charged, and therefore the state's failure to produce this evidence violated due process.

There is no question as to a showing of relevancy and materiality, since the results of the test constitute relevant, material evidence on the issue of guilt or innocence on the charge of operating a motor vehicle while intoxicated.[6] This is so because AS 28.35.033(3) provides:

> If there was 0.10 per cent or more by weight of alcohol in the person's blood,

5. 7 Alaska Adm.Code 30.060(a).

6. *People v. Hitch*, 12 Cal.3d 641, 117 Cal. Rptr. 9, 13, 527 P.2d 361, 365 (1974).

it shall be *presumed* that the person was under the influence of intoxicating liquor. [emphasis added]

As to the due process argument, Lauderdale points to the following statement of the United States Supreme Court in *Brady v. Maryland*:

[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.[7]

The difficulty with reliance on that statement is that the Supreme Court was speaking of evidence "favorable" to the accused. Here, we have no idea as to whether the evidence sought, that is, the ampoules, would be favorable to the accused or not, and this could not be known until a scientific study and analysis of the ampoules had been made.

■ But Lauderdale's point as to due process is well taken. He is asking for an opportunity to test the reliability or "credibility" of the breathalyzer test results. This is closely analagous, if not equivalent, to the case where defense counsel, by cross-examination, tests the credibility of a witness who testifies against an accused. Cross-examination in such a case is a matter of right, and the purpose of that right is to attempt to bring out facts which will tend to discredit the witness by showing that his testimony was untrue.

It does not matter that defense counsel cannot know in advance what pertinent facts may be brought out in cross-examination. As the United States Supreme Court has said:

It is the essence of a fair trial that reasonable latitude be given the cross-examiner, even though he is unable to state to the court what facts a reasonable cross-examination might develop. Prejudice ensues from a denial of the opportunity to place the witness in his proper setting and put the weight of his testimony and his credibility to a test, without which the jury cannot fairly appraise them. To say that prejudice can be established only by showing that the cross-examination, if pursued, would necessarily have brought out facts tending to discredit the testimony in chief, is to deny a substantial right and withdraw one of the safeguards essential to a fair trial. [citations omitted] [8]

■■ In essence, we have the same situation here. Lauderdale is asking for the opportunity to test the reliability or credibility of the results of the breathalyzer test. He wishes to do this by a scientific analysis of some of the components of the breathalyzer machine, that is, the ampoules, which we have held may well yield scientifically reliable data bearing on his innocence or guilt of the crime with which he is charged. A denial of the right to make such analysis, that is to say, to "cross-examine" the results of the test, would be reversible error without any need for a showing of prejudice.[9] It would be a denial of a right to a fair trial, and a fair trial is essential to affording an accused due process of law.[10] The district court was correct in suppressing the evidence of the breathalyzer test on due process grounds.

■ The state found it impossible to produce the ampoules, probably because the test ampoule, if not also the reference ampoule, was destroyed after the test was made in keeping with routine police procedures. The good or bad faith of the state

7. 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215, 218 (1963).

8. *Alford v. United States*, 282 U.S. 687, 692, 51 S.Ct. 218, 219, 75 L.Ed. 624, 628 (1931).

9. *R.L.R. v. State*, 487 P.2d 27, 44 (Alaska 1971).

10. *Massey v. Moore*, 348 U.S. 105, 108, 75 S.Ct. 145, 99 L.Ed. 135, 138 (1954); *Alexander v. Louisiana*, 405 U.S. 625, 633, 92 S.Ct. 1221, 31 L.Ed.2d 536, 543 (1972); *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297, 308 (1973).

in not being able to produce the evidence is of no import.[11] Criminal Rule 16(b)(7) contemplates discovery by an accused of relevant material that possesses materiality to the preparation of the defense. As we have stated, the ampoules were relevant and material because they were an essential part of the breathalyzer test which gives rise under the statute to a presumption of intoxication depending upon the results of the test. The existence of the rule was notice to the state that such evidence might be the object of discovery, and therefore should be preserved for a reasonable length of time. The state's duty of preservation was as operative as the duty of disclosure.[12]

The state speaks of "serious difficulties" and "tremendous efforts" in adopting procedures to preserve the ampoules. We are not convinced by this argument. We are certain that the state, with all of its vast human resources, will be able to find suitable methods to preserve the ampoules for later scientific analysis when discovery is sought by a defendant under Criminal Rule 16.

Our decision in *Lee v. State*, 511 P.2d 1076 (Alaska 1973), is no obstacle to the conclusion we have reached. In that case, the state had made a chemical analysis of a residue of white powder (heroin) found in a balloon on the accused. The analysis used up the entire amount of powder leaving nothing for the defense to test. We held that "due process of law does not require that the defendant be permitted independent examination of evidence in the possession of the prosecution before such evidence is introduced at trial."[13] We also stated:

> Under normal practices Criminal Rule 16 envisions the discovery of such evidence. In those cases where expert analysis exhausts the substance there is clearly no error in the admission of evidence regarding the analysis in the absence of allegations and proof of deliberate destruction, or deliberate attempts to avoid discovery of evidence beneficial to the defense. [footnote omitted] [14]

The *Lee* case is distinguishable. The contents of the ampoules have not been "exhausted" by any state analysis—they simply have been destroyed. What we have said in *Lee*, because of the different factual situation, is not inconsistent with what we hold in this case.

The final question is whether the rule or standards we have adopted should be applied prospectively or retroactively. As we stated quite recently in *Warwick v. State*:[15]

> A state supreme court has unfettered discretion to apply a particular ruling either purely prospectively, purely retroactively, or partially retroactively, limited only "by the juristic philosophy of the judges . . ., their conceptions of law, its origin and nature". The decision is not a matter of law, but a determination based on weighing the merits and demerits of each case. Consideration is given to applying a ruling prospectively "whenever injustice or hardship will thereby be averted." [footnotes omitted].

11. In *Wright v. State*, 501 P.2d 1360, 1371 (Alaska 1972), in discussing the problem of destruction of notes of a police officer, we stated:
    > However, if the notes in question were destroyed in good faith, without the intent to avoid production, it is the general rule that their destruction is not a ground for reversal. . . .
    That case is distinguishable. The maker of the notes, Police Captain Bellon, testified at the trial and was subject to cross-examination, even though the defense was denied the opportunity to see the notes of a former statement he had made to the state. In the instant case, the critical "witness", i. e., the ampoule, which established the presumption of Lauderdale's guilt, is not available for "cross-examination" by the defense. We believe that this difference is of major importance.

12. *See United States v. Bryant*, 142 U.S.App. D.C. 132, 439 F.2d 642, 651 (D.C.Cir. 1971).

13. *Lee v. State*, 511 P.2d 1076, 1077 (Alaska 1973).

14. *Id.*

15. 548 P.2d 384, Opn.No.1252 (Alaska 1976).

In the past, we have utilized certain criteria in solving this problem in criminal cases. They are: (1) the purpose to be served by the new standards; (2) the extent of the reliance by law enforcement authorities on the old standards and (3) the effect on the administration of justice of a retroactive application of the new standards.[16]

The purpose to be served in imposing the sanction of suppression of the breathalyzer test where the state fails to produce the ampoules when requested by defendant is to afford the defendant a fair trial.

On the other hand, we cannot ignore the fact that more likely than not it has been the standard procedure for law enforcement officials to dispose of the contents of at least the test ampoules after the breathalyzer test has been given, and that this has been done in good faith. Thus, we believe that there probably has been uniform reliance on the "old standards", i. e., on the fact that the ampoules would serve no further purpose after having been used in a test.[17]

Finally, we also cannot ignore the fact that since the law went into effect in 1970, there have been many hundreds, if not thousands, of drunk driving cases disposed of where the breathalyzer test has been used. It is fair to assume that in the great majority of these cases, which are misdemeanors, the fines have been paid, that brief jail sentences, if any, have been served, and that the periods of license suspensions have expired. It would not serve the best interest of the administration of justice to make the rule in this case retroactive so as to apply to all of those cases which have been tried and disposed of since the law went into effect.

Consideration· of the criteria regarding prospective or retroactive application leads us to the conclusion that the rule we have adopted here will be applied mainly prospectively, that is, to breathalyzer tests administered after the date of this opinion. But we qualify the prospective application by the word "mainly", because the rule will also be applied retroactively to a limited extent.

Lauderdale is the litigant in this case where the rule has been adopted, and he should be given the benefit of our decision.[18] This holding applies as well to other cases pending on review at this time.[19] In particular, our holding applies to the other petitions which have been consolidated with Lauderdale's petition, that is, petitioners Donald James Ware, Doris F. Seay and Rocko B. Fordham.

There is one final aspect of a limited retroactive application. We have been informed that there are a number of cases now pending, but not yet decided, where defendants have taken breathalyzer tests and have sought production of the breathalyzer ampoules. There may be cases filed just prior to the date of this opinion where requests for production are made following that date. The rule or standards we have adopted in this case will apply to all of those cases as well. We do not believe that this limited extension of retroactive application of the rule will have an unduly harmful or unwarranted effect on the administration of justice.[20]

In summary, the rule or standard we have announced in this case will be effective as follows:

    (1) Generally, they will have a prospective effect so as to apply only to those cases where breathalyzer tests

---

16. *Judd v. State*, 482 P.2 273, 277–78 (Alaska (1971); *Rutherford v. State*, 486 P.2d 946, 952–56 (Alaska 1971).

17. *People v. Hitch*, 12 Cal.3d 641, 117 Cal. Rptr. 9, 527 P.2d 361, 371 (1974).

18. *People v. Hitch*, 12 Cal.3d 641, 117 Cal. Rptr. 9, 19–20, 527 P.2d 361, 371–72 (1974) (dissenting opinion of Justice Mosk).

19. *Fresneda v. State*, 458 P.2d 134, 143 n. 28 (Alaska 1969); *Robinson v. State*, 484 P.2d 686, 688 n. 7 (Alaska 1971).

20. Compare the limited retroactive effect given to the doctrine of comparative negligence in *Kaatz v. State*, 540 P.2d 1037 (Alaska 1975).

have been administered after the date of this opinion.

(2) They shall have a partial retroactive effect so as to apply to

    (a) The petitioners in this case, that is, Lloyd Lauderdale, Donald James Ware, Doris F. Seay and Rocko B. Fordham; and

    (b) To cases pending in the courts which have not been completed prior to the date of this opinion, and where requests or motions for production of breathalyzer ampoules in such cases have been made prior to the date of this opinion, or are made after the date of this opinion.

The orders of the superior court are reversed and these consolidated cases are remanded for further proceedings not inconsistent with the views expressed in this opinion.

REVERSED AND REMANDED.

RABINOWITZ, J., not participating.