Dale M. GUNDERSEN, Appellant,

v.

**MUNICIPALITY OF ANCHORAGE, Appellee.**

No. A–2112.

Court of Appeals of Alaska.

Sept. 30, 1988.

106

William Grant Callow, Anchorage, for appellant.

John E. McConnaughy, III, Asst. Mun. Prosecutor, and Jerry Wertzbaugher, Mun. Atty., Anchorage, for appellee.

OPINION

Before BRYNER, C.J., SINGLETON, J., and STEWART, District Court Judge.[*]

SINGLETON, Judge.

Dale M. Gundersen was convicted by a jury of driving while intoxicated. Anchorage Municipal Code (AMC) § 09.28.020. He appeals, contending that the trial court erred in refusing to suppress the results of his Intoximeter test. He also challenges the trial court's ruling on jury instructions. We affirm.

[*] Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

## FACTS

Gundersen was arrested for driving while intoxicated after the vehicle he was driving collided with a parked car and he failed certain field sobriety tests. He was given an Intoximeter test and it registered a reading of .264 grams of alcohol per 210 liters of breath. No separate sample of Gundersen's breath was taken or preserved. After Gundersen had taken the Intoximeter test, however, Anchorage Police Officer David Koch read him a "Notice of Right to an Independent Test." The notice stated:

> You are ... under arrest for the offense of driving while intoxicated. You have provided a sample of your breath for analysis on the Intoximeter 3000. You also have a right to obtain an independent test of your blood alcohol level. If you wish to have an independent test you will be transferred to a local medical facility where a sample of your blood will be drawn by qualified personnel at no charge to you. The blood sample will be stored at the medical facility for a period of 60 days. It will be your responsibility to make arrangements for analysis of your blood sample. The analysis itself will be done at your own expense. At this time you must decide whether or not you want an independent test performed. A refusal to decide will be taken [as] a waiver of your right to obtain an independent test.... I would like you to verbally answer whether you do or do not want a separate test, then check the box, read aloud the box that you have checked and sign here at the bottom, sir. Do you have any questions about the form, Mr. Gundersen?

Gundersen declined the offer of an independent test. Thereafter, the following dialogue occurred:

GUNDERSEN: I'm kind of wondering about the reasoning of the test.

[OFFICER] KOCH: The reason that we offer the blood test is so that you will have the means ... As it says you can check the accuracy of my machine by the blood test. If you want to be able to check the accuracy, if you doubt the accuracy of the machine, anything like that....

GUNDERSEN: They're not a 100% though. The machine itself?

KOCH: Well, the machine is an extremely accurate machine.

GUNDERSEN: But it's not a 100%?

KOCH: It's acceptable within limits. It's like any other machine, sir.

GUNDERSEN: Okay. But it's not a 100% is what I'm asking.

KOCH: The machine is 100% within its capabilities.

GUNDERSEN: 100, 90, or 80?

KOCH: It's 100% within its capabilities.

## SUPPRESSION OF INTOXIMETER TEST RESULTS

Gundersen argues that his Intoximeter test should have been suppressed for a number of reasons. First, he contends that the police either intentionally or negligently misinformed him of the scope of his right to an independent chemical test of his blood alcohol level. Specifically, he argues that the form notice read by the arresting officer was incomplete because it did not make it clear to Gundersen that he could have any health professional of his choosing administer the test, and that a urine test or separate breath test could have been obtained, if he wished, in place of a blood test. Next, he argues that the form warning discouraged him from obtaining an independent test by telling him that while a blood sample would be drawn at no expense, he would have to pay for an independent test of that sample. In Gundersen's view, the officer should also have told him that if he could not afford to pay for the test, one would be provided at no charge. Finally, Gundersen contends that the officer's statement about the accuracy of the machine was incomplete because it did not mention the machine's margin of error. For all these reasons, he contends that the trial court should have suppressed his Intoximeter results.

At the outset, it is important to recognize that Gundersen's arguments rest on two slightly different rights. The first right springs from AMC § 09.28.023(E), and its

identical counterpart under state law, AS 28.35.033(e), which permit an individual arrested for driving while intoxicated, after having submitted to an Intoximeter test, to choose any qualified person to administer an independent chemical test. Similar rights arise under the Alaska Constitution. We will address Gundersen's statutory rights first, and then proceed to a discussion of his constitutional rights.

### Statutory Argument

Gundersen was arrested for driving while intoxicated. He was therefore subject to the municipality's "implied consent law," which required him to submit to a police administered chemical test of his breath or blood. AMC § 09.28.021; *Svedlund v. Anchorage*, 671 P.2d 378 (Alaska App.1983). Once he submitted to a chemical test of his breath or blood, he became eligible to have an independent test of his own choosing.

Anchorage Municipal Code § 09.28.023(E) provides:

The person tested may have a physician, or a qualified technician, chemist, registered nurse or other qualified person of his or her own choosing administer a chemical test in addition to the test administered at the direction of a law enforcement officer. The failure or inability to obtain an additional test by a person does not preclude the admission of evidence relating to the test taken at the direction of a law enforcement officer; the fact that the person under arrest sought to obtain such an additional test, and failed or was unable to do so, is likewise admissible in evidence.

Similar statutes exist in many jurisdictions and have generated a substantial amount of litigation. Some statutes expressly require that the defendant be given notice that he is entitled to an independent test. Others, including Alaska's, do not require such notice. It is generally agreed that the statutory right to an independent sobriety test is actually a motorist's right to be free of police interference when obtaining such a test by his own efforts and at his own expense. There is no statutory right to police assistance in obtaining the test. *See Weatherford v. State*, 286 Ark. 376, 692 S.W.2d 605, 606 (1985); *Commonwealth v. Alano*, 388 Mass. 871, 448 N.E.2d 1122, 1124–26 (1983). The statutes normally do not require that indigents be furnished independent tests at public expense. *See Williford v. State*, 284 Ark. 449, 683 S.W.2d 228, 229 (1985). Moreover, whether the police have substantially interfered with a defendant's opportunity to obtain an independent test is a question of fact to be decided by the trial judge. *See, e.g., Cunningham v. State*, 255 Ga. 35, 334 S.E.2d 656, 658–59 (1985). Cases interpreting similar statutes are discussed in Annotation, *Drunk Driving: Motorist's Right to Private Sobriety Test*, 45 A.L.R.4th 11–76 (1987 & Supp.1988).

Alaska law is in accord with these authorities. In *Palmer v. State*, 604 P.2d 1106 (Alaska 1979), the Alaska Supreme Court indicated that the police are under no duty to inform a defendant of his or her right to an independent test.[1] Implicitly, the statutory right in Alaska, like the statutory right in other jurisdictions, is the right of the motorist to be free of police interference when obtaining an independent test at his or her own expense. *See, e.g., Ward v. State*, 758 P.2d 87 (Alaska, 1988).[2]

---

1. AMC § 09.28.023(F) provides:

   Upon the request of the person who submits to a chemical test at the request of a law enforcement officer, full information concerning the test, including the results of it, shall be made available to him or her or his or her attorney.

   This ordinance refers to the police test, not the right to an independent test.

2. In *Ward,* the court held that the police had prevented Ward from obtaining an independent test. Ward requested an independent test at the Alaska Native Medical Center (ANMC). Initially, a trooper agreed to transport Ward to ANMC, but enroute was ordered to come back because the state had no contract with ANMC. The court found that this constituted interference with Ward's right to an independent test and suppressed evidence of his Intoximeter test. Here, Gundersen neither requested an independent test nor specified an entity or individual to perform the test. Consequently, the trial court was not clearly erroneous in concluding that the

■ In the instant case, Gundersen was informed of his right to an independent test.[3] He was offered assistance in obtaining a blood sample at municipal expense. He was also informed that any test of the blood sample would be at his expense. Clearly, the form advice of rights does not completely parallel the terms of the ordinance. In order to prevail, however, Gundersen must establish that the warning he received constituted interference, *i.e.,* prevented him from obtaining an independent test that he would have obtained had he received no warning at all. Since this is a question of fact, we will overturn the trial court's decision only if convinced that it is clearly erroneous. *Esmailka v. State,* 740 P.2d 466, 470 (Alaska App.1987).

There is nothing in the record to suggest that Gundersen wished a urine test or additional breath test as opposed to a blood test. Gundersen argues that he was "put off" because the form warning indicated that a retest would be at his expense. The ordinance does not, however, provide for retests at public expense. Thus, it is not clear that the warning was inaccurate in this respect. In any event, if Gundersen was in fact confused about his rights and misled by the police, the burden was on him to prove this. *See, e.g., Graham v. State,* 633 P.2d 211, 215 (Alaska 1981) (defendant motorist has the burden of showing that he or she was in fact confused by warnings given by the police).[4] *Cf. Barnhart v.*

*Kansas Dept. of Revenue,* 243 Kan. 209, 755 P.2d 1337, 1341 (1988) (defendant must prove insufficient notice of right to independent test adversely affected his subsequent actions); *accord Wimmer v. Motor Vehicles Div.,* 75 Or.App. 287, 706 P.2d 182, 184 (1985).

■ Gundersen's contention that the police officer's statement regarding the one hundred percent accuracy of the Intoximeter somehow misled him into giving up his right to an independent test is meritless. Gundersen had already indicated that he did not want an independent test before this conversation took place. Moreover, given the substantial Intoximeter reading Gundersen received and the circumstances of his accident, it is pure speculation that more information regarding the machine's margin of error would have persuaded Gundersen to seek an independent test. We note that the state is entitled to discover the results of any independent test actually obtained. Consequently, we should not jump to the conclusion that accused drunk drivers will readily seek independent tests. Such tests could well be used against them at trial. *See Ward v. State,* 733 P.2d 625, 626–27 (Alaska App. 1987), *rev'd on other grounds, Ward v. State,* 758 P.2d 87 (Alaska, 1988); *Russell v. Anchorage,* 706 P.2d 687, 692–93 (Alaska App.1985). *Accord State ex rel. McDougall v. Corcoran,* 153 Ariz. 157, 735 P.2d

police did not prevent Gundersen from exercising his statutory right.

3. The advice regarding an independent test was apparently prompted by our decision in *Anchorage v. Serrano,* 649 P.2d 256, 258 (Alaska App. 1982), rather than by the ordinance or comparable statute.

4. The dissent disputes this point, attempting to draw a distinction between being confused and being misled, terms which in context appear synonymous. Essentially, the dissent argues that the issue in this case is not whether Gundersen was misled or confused, but whether the warning given creates a risk that other potential recipients might be misled or confused into giving up a right that they would have asserted if no warning at all had been given. To prevent this potential harm, the dissent is prepared to adopt a prophylactic rule mandating suppression of presumably accurate and material evidence. In the view of the dissent, failure to

adopt a purely prophylactic rule "trivializes the significance of the statutory right to an independent test of the defendant's choosing...."

The dissent commits two significant errors. First, it only deals superficially with *Palmer* and *Graham.* Neither case is an aberration; both are consistent with the weight of authority. Read together, *Graham* and *Palmer* clearly indicate that a person who is confused by warnings regarding independent tests must prove prejudice. The law in other jurisdictions is in accord.

Second, and more important, the right in question is a legislative right and the legislature has already balanced that right against the possible loss of material evidence and concluded that in the absence of proven interference, material evidence should not be suppressed. AMC § 09.28.023(E). We are simply carrying out legislative intent.

767, 771 (1987); *State v. Strong,* 504 So.2d 758, 760 (Fla.1987). The trial court was not clearly erroneous in holding that Gundersen failed to meet his burden of proving that the police warning constituted an interference which prevented him from obtaining an independent test.

■ In a related argument, Gundersen contends that his waiver of his statutory right to an independent test was not knowing, intelligent, or voluntary. In Gundersen's view, the record would not support a finding of waiver. The trial court did not directly address this contention but implicitly held that Gundersen forfeited his right to an independent test by not making timely efforts to obtain one. Gundersen fails to recognize the distinction between waiver and forfeiture.

A true waiver is "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). In contrast, a forfeiture is the loss of a right through failure to timely assert it. We have discussed the distinctions between waiver and forfeiture in a number of cases. *See Mekiana v. State,* 707 P.2d 918, 920 (Alaska App.1985), *rev'd on other grounds,* 726 P.2d 189 (Alaska 1986); *State v. R.H.,* 683 P.2d 269, 281–82 (Alaska App.1984); *Wilson v. State,* 680 P.2d 1173, 1175–76 (Alaska App.1984); *Lemon v. State,* 654 P.2d 277, 279 (Alaska App.1982), *and see Andrew v. State,* 694 P.2d 168, 172–74 (Alaska App.1985) (Singleton, J., concurring). *See also* Rubin, *Toward a General Theory of Waiver,* 28 U.C. L.A. L.Rev. 478 (1981) (hereinafter Rubin); *Westen, Away From Waiver: A Rationale For the Forfeiture of Constitutional Rights in Criminal Procedure,* 75 Mich.L. Rev. 1214 (1977) (hereinafter Westen); Tigar, *Forward: Waiver of Constitutional*

*Rights: Disquiet in the Citadel,* 84 Harvard L.Rev. 1 (1970); Westen & Mandell, *To Talk, to Balk, or to Lie: The Emerging Fifth Amendment Doctrine of the "Preferred Response",* 19 Amer.Crim.L.Rev. 521 (1982).

The term "waiver" is frequently used by Alaska courts to refer to both true waivers and forfeitures. *Andrew,* 694 P.2d at 172. The Alaska Supreme Court has never developed a general theory for distinguishing between those rights which may be forfeited and those that must be waived. *But see Lanier v. State,* 486 P.2d 981, 983–88 (Alaska 1971) (distinguishing between waivers during trial and pre-trial and post-trial waivers).[5] Although it has been suggested that rights created by rule or statute may be forfeited, but rights derived from the constitution must be waived, the case law does not support this distinction. In a number of situations the Alaska Supreme Court has permitted forfeiture of some constitutional rights but required waiver of others. The refusal to find all errors affecting a constitutional right to be plain error, *per se,* under Alaska Criminal Rule 47(b), indicates that some constitutional rights may be forfeited. *See, e.g., Gilbert v. State,* 598 P.2d 87, 92 (Alaska 1979). *See also Moreau v. State,* 588 P.2d 275, 280 and nn. 14–15 (Alaska 1978) (court ordinarily refuses to consider errors regarding suppression motions unless preserved in the trial court, *i.e.,* applying forfeiture rules). In addition, a plea of guilty or *nolo contendere* will effectively forfeit many constitutional rights of a defendant. *Barrett v. State,* 544 P.2d 830, 833–34 (Alaska 1975) (incantation of constitutional rights not required for valid plea if circumstances show plea was voluntary). *See also Westen, supra,* at 1215–39.

5. In *Lanier,* the court considered a related question, which constitutional rights must be personally waived by a defendant and which may be waived by his or her attorney without consultation. The court viewed the question as primarily one of federal constitutional law guided by *Fay v. Noia,* 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963). *Lanier,* 486 P.2d at 986. The court concluded that in the absence of extraordinary circumstances counsel could waive

a defendant's rights during trial but that the defendant would have to join in the waiver of pretrial and post-trial rights. *Id.* at 988. The weakening of the authority of *Fay v. Noia,* noted in *Lanier,* 486 P.2d at 985–86, has continued in the years since *Lanier* was decided in 1971. *See Westen, supra.* It is not necessary for us to explore this issue further, however, because this case does not involve the purported waiver or forfeiture of a constitutional right by counsel.

The primary distinction between waiver and forfeiture lies in the requirement that a party have knowledge of his or her rights. If the courts require a showing that defendants must have had knowledge of their right before treating their actions as depriving them of that right, then it is applying a waiver rule. In contrast, if defendants may lose their rights without knowing that they exist, then the court is permitting forfeiture. *See, e.g.,* Rubin, *supra,* at 496–98.

In the case of pretrial rights, where a person is not normally represented by an attorney, a requirement that the defendant have knowledge of his right before he can be held to have lost it invariably requires some type of a warning. This is the context in which *Miranda* operates. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In *Palmer v. State,* 604 P.2d 1106 (Alaska 1979) the Alaska Supreme Court made it clear that no warning of the right to an independent test was required. The supreme court clearly intended to apply a forfeiture rule, rather than a waiver rule, to the statutory right to an independent test. Although it is less clear why the court reached this conclusion, other jurisdictions have almost universally reached the same result. *See* Annot. 45 A.L.R.4th 11 *et seq.*

A number of reasons may explain the use of a forfeiture rule. In choosing whether to permit forfeiture or require waiver of a given right, the court must balance the significance of the possible loss of the affected right, in the context in which it arises, against the burden to the administration of justice resulting from a requirement of proof of the defendant's actual knowledge of the right. In striking such a balance, the courts should require waiver if the right is crucial to a fair trial, but permit forfeiture if the right is less significant.

Applying this balancing test to a defendant's right to an independent chemical test to determine blood alcohol level, a number of factors must be considered. First, there is a strong public interest in identifying and neutralizing drunk drivers. Courts have recognized the danger presented by drunk drivers in a number of cases. *See, e.g., Tulowetzke v. State,* 743 P.2d 368 (Alaska 1987); *Ebona v. State,* 577 P.2d 698 (Alaska 1978). Second, the Intoximeter and other state administered blood tests are considered to have substantial value as evidence in proving drunk driving. *Wester v. State,* 528 P.2d 1179, 1183 (Alaska 1974), *cert. denied,* 423 U.S. 836, 96 S.Ct. 60, 46 L.Ed.2d 54 (1975). Third, there is a corresponding likelihood that an independent test, if performed, will corroborate rather than invalidate the state's test. *See California v. Trombetta,* 467 U.S. 479, 489, 104 S.Ct. 2528, 2534, 81 L.Ed.2d 413 (1984); *Best v. Anchorage,* 749 P.2d 375, 381–82 (Alaska App.1988). Finally, there is the difficulty of proving knowledge of the right to an independent test, particularly when the person whose knowledge is in question is *prima facie* intoxicated. If warnings are required, there would be a substantial increase in litigation over their content. The more guilty a person is of drunk driving, *i.e.,* the more intoxicated the person is, the better the argument becomes that he or she could not understand or was confused or misled by any warnings given.

These considerations may well have led the Alaska Supreme Court in *Palmer,* as well as the Alaska legislature and the Anchorage Municipal Assembly, in enacting respectively the statute and the ordinance, to conclude that a statutory right to an independent test should be available but that it should be forfeited if not demanded. Authorities from other jurisdictions appear to be in accord. Controversies over warnings should not, under this theory, result in the suppression of valuable evidence. *See, e.g.,* AMC § 09.28.023(E) ("... the failure or inability to obtain an additional test by a person does not preclude the admission of evidence relating to the test taken at the direction of a law enforcement officer").

### Constitutional Argument

We next turn to Gundersen's rights under the Alaska Constitution. In a criminal case, the municipality is under a constitu-

tional due process obligation to make available to the defense evidence in its possession that is both favorable to the accused and material to guilt or punishment. *See Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The United States Constitution does not establish a right to an independent chemical test in drunk driving cases. *Trombetta,* 467 U.S. 479, 104 S.Ct. 2528. In contrast, Alaska courts have held that the state constitution requires that the police must obtain and preserve a breath sample, or provide some other means of independently verifying the accuracy of the results of the police-administered chemical test of the driver's blood or breath. *See Briggs v. State,* 732 P.2d 1078, 1080 (Alaska 1987); *Champion v. Department of Public Safety,* 721 P.2d 131, 132 (Alaska 1986); *Lauderdale v. State,* 548 P.2d 376, 381 (Alaska 1976); *Anchorage v. Serrano,* 649 P.2d 256, 258–59 (Alaska App.1982).

■ This obligation exists independently of the statutes and ordinances previously discussed. An independent test obtained under the ordinance or statute would nevertheless probably satisfy the constitutional obligation. The police did not retain a breath sample in this case. In *Serrano,* however, we recognized that the independent verification requirement might be satisfied in a variety of ways. We suggested that one way to satisfy the requirement would be for the police to offer the accused assistance in obtaining an independent chemical test as provided for under AS 28.35.033(e) and AMC § 09.28.023(E). *Serrano,* 649 P.2d at 258 n. 5.

Because the sole function of the *Brady/Serrano* due process requirement is to assure the accused an accurate and objective means of verifying the Intoximeter test results, compliance can be achieved by offering individuals arrested for driving while intoxicated any means of verification that is reasonable and at least roughly comparable in accuracy and reliability with the testing of a breathalyzer ampoule or preserved Intoximeter breath sample. The underlying concern of the state constitutional requirement implies no need to provide the accused with a choice of different tests or a choice of qualified persons to administer the test.

■ In the instant case, the police did not seek to preserve a sample of Gundersen's breath. Instead, they made an effort to comply with the *Serrano* requirement by offering to take Gundersen to a local hospital to have a blood sample drawn at the expense of the municipality by qualified hospital personnel. It is undisputed that the blood sample would have provided Gundersen with a reliable and accurate means of verifying his Intoximeter result.

■ Certainly, the police might have sought to comply with the due process requirement by attempting to preserve a breath sample, by offering some other form of independent chemical test, or by offering a choice of independent tests. Due process under the Alaska Constitution, however, requires only that Gundersen be given a reasonable opportunity to verify the Intoximeter test result. Gundersen has presented no evidence to support the conclusion that the police acted arbitrarily or unreasonably in offering him a blood test instead of a urine test or attempting to preserve a sample of his breath. Experience suggests that the preservation of accurate and reliable breath samples may be far more difficult and costly in practice than in theory. *See generally State v. Kerr,* 712 P.2d 400 (Alaska App.1985); *Best v. Anchorage,* 712 P.2d 892 (Alaska App.1985). Nor can we say that the drawing of blood is so intrusive a procedure as to be an unreasonable alternative *per se. See Ward v. State,* 733 P.2d at 627. We therefore conclude that Gundersen's constitutional rights under *Briggs* and *Serrano* were satisfied by the offer of assistance in obtaining an independent blood test. We stress that this issue is resolved according to state law inasmuch as there is no due process right to an independent test under federal constitutional law. *See Trombetta,* 467 U.S. 479, 104 S.Ct. 2528.

■ Does constitutional due process require that an independent test be furnished free of charge to indigents? In *Evitts v. Lucey,* 469 U.S. 387, 401–02, 105 S.Ct. 830,

838–839, 83 L.Ed.2d 821 (1985), the Supreme Court suggested that states may be under a constitutional duty to safeguard rights given by statute even if those rights are not independently mandated by the constitution. The courts that have considered this issue have concluded that neither constitutional due process nor equal protection of the laws under the United States Constitution requires that independent tests be furnished free of charge to indigents even though the state affords a right to an independent test. *See, e.g., Scarborough v. Kellum,* 525 F.2d 931, 933 (5th Cir.1976); *Capler v. City of Greenville, Mississippi,* 422 F.2d 299, 301 (5th Cir.1970); *Smith v. Cada,* 114 Ariz. 510, 562 P.2d 390, 392–93 (App.1977); *Commonwealth v. Tessier,* 371 Mass. 828, 360 N.E.2d 304, 305–06 (1977); *cf. State v. Coy,* 48 Or.App. 267, 616 P.2d 1194, 1195 (1980) (police officer's statement that blood test was available only at defendant's expense did not mislead defendant into thinking he had no right to refuse breath test).

■ It is not necessary for us to decide whether the Alaska Constitution guarantees a free independent test to indigents because there is nothing in the record to suggest that Gundersen is indigent. *See State v. Alcorn,* 125 N.H. 672, 484 A.2d 1176, 1180 (1984). Gundersen does not point to anything in the record implying that he was personally discouraged from obtaining an independent test. There is no evidence suggesting that he is indigent, would prefer a urine test, or had special confidence in some other health professional.

Gundersen asks this court to adopt a prophylactic rule, from which he would incidentally benefit, suppressing Intoximeter evidence in order to coerce the municipality into a more complete advisement of the right to an independent test. Arguably, more people would avail themselves of the right to such a test if they knew it was completely free, included urine tests, and could be performed by any health professional. We do not believe that valuable evidence of a serious crime should be suppressed in pursuit of such speculative goals, particularly when independent tests, if obtained, would more often than not corroborate rather than undermine prosecution evidence.

## JURY INSTRUCTIONS

■ Gundersen next argues that the trial court erred by failing to give his proposed jury instruction, which quoted AMC § 09.28.023(E) in part, and then concluded:

> If you find that the officer failed to properly advise the defendant of his rights to an independent chemical test, you may consider that fact as a factor bearing on the credibility of the officer and accuracy of the breath test administered by the officer or at his direction.

■ The trial court is under a duty to fully instruct the jury on the elements of the offense and any available defenses. Whether or not a particular instruction should be given is within the trial court's discretion. *Buchanan v. State,* 561 P.2d 1197, 1207 (Alaska 1977). The court has broad discretion regarding instructions on the credibility of witnesses. *Id.* The statutory warnings are not elements of the offense, and an inaccurate warning does not constitute a defense. It may, however, be relevant to the defendant's *"mens rea." Brown v. State,* 739 P.2d 182, 185–86 (Alaska App.1987).

We conclude that the trial court did not abuse its discretion by rejecting Gundersen's proposed instruction. We recognize that AMC § 09.28.023(E) provides in part: "[T]he fact that the person under arrest sought to obtain such an additional test and failed or was unable to do so is likewise admissible in evidence." *See also State ex rel. McDougal v. Corcoran,* 735 P.2d at 771 (holding that such evidence is admissible against the defendant). Here, however, it does not appear that Gundersen sought but failed to obtain an additional test. Nor does it appear from the record that Gundersen offered evidence establishing a nexus between the warnings he did receive and the credibility of the officer or the validity of the officer's test. *Cf. Trombetta,* 467 U.S. at 489, 104 S.Ct. at 2534 (accuracy of "intoxilizer" test, as shown in the record,

indicates a low probability that preserved breath samples would exculpate suspected drunk driver).

In the absence of some evidence to the contrary, an independent test would as likely corroborate as invalidate the municipality's test. *See, e.g., Best v. Anchorage,* 749 P.2d 375, 382 (Alaska App.1988). This is not a case in which there is some evidence of a bad faith attempt by the municipality to discourage Gundersen from obtaining an independent test. Such evidence, if present, might support an inference that the officers lacked confidence in the integrity of their own test, justifying a spoliation instruction. *See, e.g., Williams v. State,* 629 P.2d 54, 64 n. 22 (Alaska 1981); *Putnam v. State,* 629 P.2d 35, 43 (Alaska 1980). *See also State v. Hansen,* 156 Ariz. 291, 751 P.2d 951, 955 (1988) (discussing circumstances under which spoliation instruction is warranted). There is nothing in this record to suggest that the municipality intentionally or negligently failed to produce the strongest evidence available to it, or that an independent test, if obtained, would have been exculpatory. *See Fletcher v. Anchorage,* 650 P.2d 417, 418 (Alaska App.1982). We therefore decline to follow *People v. Alvarado,* 181 Cal.App.3d Supp. 1, 226 Cal.Rptr. 329, 331 (1986) (supporting giving an instruction similar to the one requested by Gundersen). In our view, Gundersen's proposed instruction would only have led to jury speculation.

■ Gundersen next argues that the trial court erred in failing to give his instruction permitting the jury to consider whether the person administering his breath test complied with the relevant procedures.[6] The court gave the following instruction:

6. Gundersen's proposed instruction read as follows:

When a chemical test is given, and testimony concerning the result is admitted into evidence, you are not conclusively bound by the result of such evidence. To determine the reliability of such evidence, you should weigh and consider whether or not the person administering the test complied with all the required test procedures and safeguards. If the evidence relating to said test leaves you with a

There has been evidence in this case that the defendant submitted to a breath test.

If you find that [the] defendant took a breath test within four hours of the offense alleged and that an accurate result was obtained, you may infer from such result that the defendant's breath alcohol content at the time of the test was equal to or less than the defendant's breath alcohol content at the time he operated a motor vehicle.

However, if there is other evidence that the breath test did not produce a result which accurately reflected the defendant's alcohol level at the time of the test, or that the defendant's breath alcohol level may have been less than such result at the time he operated a motor vehicle; then you must consider all of the facts and circumstances in evidence in determining whether the defendant's breath alcohol content was .10 grams of alcohol per 210 liters of breath or greater at the time he operated a motor vehicle, no longer relying exclusively on the results of the breath test.

The trial court was within its discretion in giving this instruction rather than Gundersen's. *Buchanan,* 561 P.2d at 1207. In our view, the instruction given more accurately reflects the law and permitted the defendant to argue that the breath test administered by the police was improperly administered and therefore inaccurate. We note that Gundersen does not point to any specific evidence suggesting that, as his proposed instruction stated, "the person administering the test [failed to comply] with all of the required test procedures and safeguards."

■ The judgment of the district court is AFFIRMED.[7]

reasonable doubt as to its accuracy, you may ignore the results of such test.

7. Gundersen also argues that the trial court erred in instructing the jury as follows:

The defendant has been charged with one criminal offense, driving while intoxicated, which may be proven in either of two ways: the municipality must prove beyond a reasonable doubt that defendant drove either while under the influence of intoxicating liquor or

BRYNER, C.J., dissents.

COATS, J., not participating.

BRYNER, Chief Judge, dissenting.

I am unable to agree with the majority's disposition of Gundersen's principal argument—that he was affirmatively misled concerning his statutory right to obtain an independent test conducted by a person of his own choosing.

Gundersen was arrested for DWI after being involved in an automobile accident in Anchorage. He was given an Intoximeter test and registered a reading of .264. No separate sample of Gundersen's breath was taken or preserved. After Gundersen had taken the Intoximeter test, however, an Anchorage police officer read him a "Notice of Right to an Independent Test." The notice stated:

> You are ... under arrest for the offense of driving while intoxicated. You have provided a sample of your breath for analysis on the Intoximeter 3000. You also have a right to obtain an independent test of your blood alcohol level. If you wish to have an independent test you will be transferred to a local medical facility where a sample of your blood will be drawn by qualified personnel at no charge to you. The blood sample will be stored at the medical facility for a period of 60 days. It will be your responsibility to make arrangements for analysis of your blood sample. The analysis itself will be done at your own expense. At this time you must decide whether or not you want an independent test performed. A refusal to decide will be taken [as] a waiver of your right to obtain an independent test.... I would like you to verbally answer whether you do or do not want a separate test, then check the box, read aloud the box that you've checked and sign here at the bottom, sir. Do you have any questions about the form, Mr. Gundersen?

Gundersen declined the offer of an independent test.

Prior to trial, Gundersen moved to suppress the results of the Intoximeter test, alleging, *inter alia,* that his rights under the Alaska Constitution had been violated by the municipality's failure either to preserve a separate breath sample or to inform him fully of the statutory right to an independent chemical test of his own choosing. District Court Judge Natalie K. Finn denied Gundersen's motion, finding that the offer of an independent blood test that had been communicated to Gundersen was sufficient to protect his constitutional and statutory rights. Gundersen argues on ap-

---

with a level of .10 grams of alcohol per 210 liters of his breath. You must be unanimous in your verdict. You need not be unanimous, however, on which of the two theories the municipality has proven. It is sufficient that each of you is convinced of defendant's guilt beyond a reasonable doubt under one theory or the other.

The trial court relied on *State v. James,* 698 P.2d 1161, 1165 (Alaska 1985). We have upheld giving this instruction. *Ward v. State,* 733 P.2d 625, 627 (Alaska App.1987), *rev'd on other grounds,* 758 P.2d 87, 89–92 (Alaska, 1988). The supreme court affirmed that decision insofar as it upheld the use of this instruction. *Ward,* 89–92. Gundersen asks that we reconsider *Ward,* making arguments considered and rejected in that case. The Alaska Supreme Court's decision is binding on us regarding those arguments.

He points out, however, that in two decisions we have struck down a prior version of Anchorage's .10 blood alcohol level ordinance on the ground that it was inconsistent with the provisions of state law, then existing, which permit-

ted conviction for driving under the influence, but did not permit conviction for a .10 blood alcohol level. *See, e.g., Anderson v. Anchorage,* 645 P.2d 205, 213 (Alaska App.1982); *Simpson v. Anchorage,* 635 P.2d 1197, 1205 (Alaska App. 1981). We believe those cases are distinguishable. Essentially, they were directed at the power of Home Rule municipalities to legislate in areas in which the state has also legislated. We are satisfied that the state legislature and the municipal assembly, in enacting identical prohibitions, have determined, as a legislative fact, that a person with .10 grams of alcohol per 210 liters of breath is driving under the influence of alcohol because, as a matter of law, the use of the person's physical or mental abilities is so impaired that he or she no longer has the ability to operate a vehicle with the caution characteristic of a person of ordinary prudence who is not under the influence of alcohol.

In summary, we are satisfied that the legislature and the municipal assembly intended that the two approaches to driving while intoxicated would simply be variant ways of proving the same thing.

peal that the district court erred in its ruling.

The analysis of Gundersen's argument begins with the recognition that it addresses two separate rights. The first right arises under the Alaska Constitution's guarantees of confrontation and due process and was initially recognized by the Alaska Supreme Court in *Lauderdale v. State*, 548 P.2d 376 (Alaska 1976). There, the court, in order to provide a means of confronting and cross-examining breathalyzer evidence, required the police to preserve and make available for inspection ampoules used in administering individual breathalyzer tests.

The second right springs from Anchorage Municipal Code (AMC) § 09.28.023(E) and its counterpart under state law, AS 28.35.033(e), which permit an individual arrested for DWI, after submitting to an Intoximeter test, to choose any qualified person to administer an independent chemical test:

> The person tested may have a physician, or a qualified technician, chemist, registered nurse, or other qualified person of his or her own choosing administer a chemical test in addition to the test administered at the direction of a law enforcement officer. The failure or inability to obtain an additional test by a person does not preclude the admission of evidence relating to the test taken at the direction of a law enforcement officer; the fact that the person under arrest sought to obtain such an additional test, and failed or was unable to do so, is likewise admissible in evidence.

Though in many respects the constitutional and statutory rights are closely related, they are nevertheless conceptually independent and require separate consideration. Here, it is necessary to consider only Gundersen's statutory right. This court has previously noted that the primary concern of the statutory right is much the same as the underlying concern of the *Lauderdale/Serrano* constitutional requirement: "to provide a defendant with an independent basis for challenging a breathalyzer reading." *Ward v. State*, 733 P.2d 625,

627 (Alaska App.1987), *rev'd on other grounds*, 758 P.2d 87, (Alaska, 1988).

Nevertheless, the precise scope of the statutory right significantly differs from that of the constitutional right. In one respect, the statutory right is narrower than the constitutional requirement, since the statute imposes no obligation on the police to assist DWI arrestees in obtaining an independent test. In another respect, however, the statutory right is broader than the constitutional right, because the statute expressly extends to the accused the choice of any competent form of independent testing and any qualified person to administer the independent test. *See Whisenhunt v. State*, 746 P.2d 1298, 1299 (Alaska 1987).

In *Palmer v. State*, 604 P.2d 1106 (Alaska 1979), the Alaska Supreme Court held that the police need not expressly advise persons who are arrested for DWI of their statutory right to an independent chemical test of their own choosing. In this appeal, Gundersen questions whether the holding in *Palmer* remains valid under current DWI and implied consent statutes. This issue need not be decided, for it is evident that, when the police do undertake to provide information concerning the right to independent chemical testing, the information must, at a minimum, be reasonably accurate and complete, so that arrestees are not misled as to the nature and scope of their statutory rights.

Our past decisions have recognized as much. In *Ward*, 733 P.2d 625, Ward was arrested for DWI and underwent an Intoximeter test. A sample of his breath was preserved to provide an opportunity for independent testing. In addition, the police offered to transport Ward to either of two Anchorage hospitals to have a blood sample drawn and preserved for later testing. He declined to be tested at either of the two hospitals suggested by the police and insisted on being taken to a third hospital. The police refused to comply with this request.

On appeal, Ward claimed that the failure by the police to take him to a hospital of his choice deprived him of both his constitu-

tional and statutory rights to an independent test. Finding that the police had satisfied Ward's due process rights under *Lauderdale* and *Serrano* by preserving a sample of his breath, this court rejected his constitutional claim.

We separately held that Ward had not been denied his statutory right to an independent chemical test of his own choice. In so doing, we reasoned that, having complied with the *Lauderdale/Serrano* requirement by preserving a separate breath sample, the police had no obligation to assist Ward in effectuating his statutory right to obtain an independent chemical test of his own choice. We found that, even though the police had declined to help Ward obtain the independent test of his choice, they had apparently neither said nor done anything to discourage him from obtaining that test on his own accord.

Implicit in our holding in *Ward* is the conclusion that Ward's statutory right to an independent test would have been violated had he actually been deterred in any significant way from obtaining an independent test of his own choosing.[1]

Following the issuance of this court's opinion in his case, Ward petitioned the Alaska Supreme Court for hearing, challenging, among other things, our conclusion that the police did not interfere with his right to an independent test. The supreme court reversed this court's decision. In reversing, the supreme court agreed with Ward's contention that the police conduct in his case had interfered with his right to an independent test. Emphasizing the fact that, under the statutory language, "Ward had the right to have a blood test performed by 'a . . . qualified person of [his] own choosing . . .,'" the supreme court concluded that "[t]he Troopers denied Ward the right to obtain such a test after they had agreed to transport him to [Alaska Native Medical Center]. This was a violation of Ward's right under AS 28.35.-033(e)." *Ward,* 758 P.2d 87, at 89–90.

The supreme court's decision in *Ward* thus made explicit what this court's previous decision left implicit: although the police may have no affirmative duty to provide information or assistance, once they do advise or assist persons arrested for DWI in obtaining an independent test, any significant restriction of the right to have the test performed by a person of the arrested person's own choosing will constitute a violation of the statutory guarantee. *Id.* The appropriate remedy for such violations is the suppression of the Intoximeter test results. *Id.* at 90–91.

If it was not clear before the supreme court's decision in *Ward,* it certainly seems clear now that the advice read to Gundersen by the police in the present case directly contravened the statutory guarantee of an independent test of choice. In the present case, as in *Ward,* the police extended a limited offer of assistance in securing an independent chemical test. In contrast to *Ward,* however, the present case involved more than a limited offer of assistance: the advice contained in the "Notice of Right to an Independent Test" strongly suggested that the exclusive option open to Gundersen for obtaining an independent chemical test was an immediate blood test in police custody, at a hospital of the municipality's choosing. The notice that was read to Gundersen purported to define his "right to obtain an independent test," without any attempt to make it clear that the limited right described in that notice was not Gundersen's only right. The notice seemingly left Gundersen a single choice, stating, "if you wish to have an independent test *you will be transferred to a local medical facility where a sample of your blood will be drawn . . .*" (emphasis added). The notice did not inform Gundersen that his failure to request the offered blood test would result only in the loss of police assistance; instead, it flatly told him that refusal to immediately request the offered

---

1. Likewise, in *Anchorage v. Serrano,* while recognizing that the prosecution's constitutional duty to provide a reliable means of verifying the Intoximeter might be satisfied by offering to assist the accused in securing an independent test, we emphasized that it would then be necessary to clearly and expressly inform the accused of the statutory right to an independent test of the accused's choosing. *Serrano,* 649 P.2d at 256 n. 5 (Alaska App.1982).

test would amount to a waiver of his right to any independent testing:

> At this time you must decide whether or not you want an independent test performed. A refusal to decide will be taken [as] a waiver of your right to obtain an independent test.

By effectively characterizing the offer of an immediate blood test as Gundersen's sole opportunity for an independent test, the "Notice of Right to an Independent Test" was substantially misleading. If Gundersen had previously been unaware of his right to an independent test, he would have had little reason to disbelieve the unduly restricted explanation of that right given by the police. Even if Gundersen had been generally aware of the statutory right to an independent test, he would almost certainly have been led to conclude that his right was the limited right described in the notice. Because the notice described a test that was to be conducted in a facility chosen by the police and under circumstances virtually assuring police access to the test results, Gundersen might well have decided to decline the offer without giving any thought to the desirability of a test conducted by a person of his own choosing. Having been informed that he must either request the test immediately or waive his right to an independent test altogether, Gundersen would thereafter have had no reason or motivation to seek an independent test on his own. Thus, the effect of the improper notice could only have been to discourage Gundersen from making any effort to obtain an independent test of his own choosing.

The majority of the court reaches a contrary conclusion. In defense of its holding, the majority, on the one hand, trivializes the significance of the statutory right to an independent test of the defendant's choosing and, on the other hand, suggests that Gundersen has failed to show prejudice: "[I]f Gundersen was in fact confused about his rights and misled by the police, the burden was on him to prove this." In support of this latter contention, the majority cites *Graham v. State*, 633 P.2d 211, 215 (Alaska 1981). *Graham*, however, is inapposite.

*Graham* was an appeal from an administrative revocation of a driver's license; the revocation was based on Graham's refusal to take a breath test following her arrest for DWI. On appeal, Graham argued that there is an inherent potential for confusion when a person arrested for DWI is asked to submit to a breath test after being given *Miranda* warnings describing the right to remain silent and the right to immediate appointment of counsel. Graham maintained that her refusal could not be used as a basis for revoking her license, because her arresting officer did not explain that her *Miranda* rights did not apply to the statutorily required breath test.

The court in *Graham* agreed that the refusal to take a breath test cannot be used against a defendant when it results from confusion between the scope of *Miranda* rights and the duties imposed by the implied consent statute. Nevertheless, a majority of the court held that Graham had the burden of establishing that her refusal had actually resulted from confusion over the nature of her rights. After reviewing the record, the majority concluded that Graham had failed to meet this burden.

Under the circumstances in *Graham*, where there was an inherent possibility of confusion between two apparently contradictory demands, the requirement that the accused demonstrate prejudice in a subsequent administrative proceeding for the revocation of her license is understandable. It makes good sense to expect that most individuals who refuse to take a breath test in mistaken reliance on their *Miranda* rights will either change their mind or make their confusion known when expressly given the requisite implied consent warning. It is not unreasonable to require those individuals who persist in their refusal to take the test without expressing any confusion as to their rights to make an affirmative allegation and showing of actual confusion before administrative action against their license is precluded.

The only relevant issue in such circumstances is what actually motivated the defendant's decision not to take the test. For

example, if Graham had demonstrated that she was actually confused as to the scope of her rights when she refused the breathalyzer, she presumably would not have been required to make an additional showing that she would have submitted to the test had she not been confused.

In contrast, under the circumstances of the present case, the issue of prejudice does not hinge on what actually did happen. The question of what actually motivated a person to decline an offer of assistance in obtaining an independent test is not determinative. Prejudice could be established by showing either that the incorrect advice actually led the accused to decline police assistance in obtaining an independent test or that the accused might have elected to seek independent testing—either with police assistance or on his own accord after release on bail—had correct advice been given or had no advice been given at all.

The danger inherent in "Notice of Right to an Independent Test" is not that it might confuse but rather that it might mislead. The logical response of a person exposed to the incorrect advice contained in the notice would be to believe it and to make a choice based on the assumption that the advice was correct. No confusion whatsoever would be involved. The only people who might be confused would be those rare individuals who were expressly aware of the specific scope of the statutory right to an independent test.

In opposition to the situation in *Graham,* there is no reason to expect that persons who have been misled as to the scope of their statutory right to an independent test would be in any position to recognize the conflict between the advice contained in the "Notice of Right to an Independent Test" and the provisions of the law creating the right to an independent test of choice. The possibility that misleading advice has been given will not even occur to most people until a later date, when they first come into contact with an informed attorney. By that time, the question of whether any prejudice resulted from the misleading advice will involve little more than subjective, after-the-fact speculation about what might have happened had the police done things otherwise.

While on occasion something said or done at the time an independent test was refused might make it clear that the defendant would have declined independent testing under any conceivable circumstances, in virtually all other cases defendants could honestly state that they might have made a different choice with respect to independent testing had different advice been given by the police. The purely conjectural, *post hoc,* and subjective context within which the issue of prejudice would almost inevitably have to be decided would predictably reduce the process of establishing prejudice to a hollow, formalistic ritual in which the defendant would be paraded to the stand to testify confidently that things might have been different if they had been different.

The artificiality of attempting to determine actual prejudice in this situation is one of the chief reasons why no showing of prejudice has been deemed necessary in analogous situations involving incorrect or misleading advice. In the area of *Miranda* rights, for example, violations have consistently been found to require reversal without any need to ask whether any actual harm resulted to the accused. *See, e.g., Webb v. State,* 756 P.2d 293 (Alaska 1988).

. In the present case, Gundersen undoubtedly could have testified at his suppression hearing that he might have elected to have an independent test performed by a person of his own choosing but for the improperly restricted advice that he was given by the police. In all likelihood he did not so testify because his attorney—guided by the analogous area of *Miranda* cases and unaware of any prior decisions adopting a contrary rule in the circumstances of the present case—perceived no need for a *pro forma* testimonial claim of harm.

It seems doubly unfair for the majority of the court to announce a procedural rule requiring proof of prejudice and to fault Gundersen for failing to comply with that rule. The rule did not exist until today. If the majority of this court were truly con-

vinced of the need for a showing of prejudice in cases such as this, the appropriate measure would be a remand to allow Gundersen to testify on the issue. As it is, it appears to me that the majority of the court is doing little more than embracing a strained application of an ill-conceived procedural technicality in order to justify the conviction of a person whom the court perceives to be obviously guilty.

Because there is an inherent risk that the misleading notice may in fact have discour-

aged Gundersen from seeking an independent chemical test of his own choosing, I would hold that the notice violated his rights under AMC § 09.28.023(e) and that the violation required suppression of his Intoximeter result.