NOTICE

*The text of this opinion can be corrected before the opinion is published in the Pacific Reporter. Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*
*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections @ akcourts.gov*

# IN THE COURT OF APPEALS OF THE STATE OF ALASKA

LAUREL LEE,

Appellant,

v.

STATE OF ALASKA,

Appellee.

Court of Appeals No. A-12797
Trial Court No. 3KN-14-01547 CR

O P I N I O N

No. 2715 — November 26, 2021

Appeal from the Superior Court, Third Judicial District, Kenai, Carl Bauman, Judge.

Appearances: Michael L. Barber, Barber Legal Services, Anchorage, under contract with the Office of Public Advocacy, for the Appellant. Diane L. Wendlandt, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for the Appellee.

Before: Allard, Chief Judge, and Wollenberg and Harbison, Judges.

Judge ALLARD.

Following a jury trial, fifty-one-year-old Laurel Lee was convicted of second-degree sexual abuse of a minor based on allegations that she performed fellatio

on a fourteen-year-old boy, C.L.[1]  On appeal, Lee argues that the State violated her state and federal due process rights, as well as the evidence preservation requirements of AS 12.36.200(a)(2), by failing to preserve biological evidence that was consumed during DNA testing.

For the reasons explained in this opinion, we conclude that the State complied with the requirements of AS 12.36.200(a)(2) and that Lee's due process rights were not violated.  We note, however, that the State's failure to notify defendants before undertaking testing that will consume evidence could subject them to future due process challenges.

*Factual and procedural background*

In September 2014, fourteen-year-old C.L. was riding his bicycle on a sidewalk near his home in Sterling when he encountered a woman he did not know, later identified as Laurel Lee.  C.L. described Lee as intoxicated and "out of [her] right mind." C.L. testified that Lee grabbed C.L.'s arm, pulled him off of his bicycle, and dragged him into a nearby wooded area.

According to C.L., once they were in the woods, Lee pinned him to the ground, pulled down his pants, and forcibly performed fellatio on him.  C.L. testified that, after a couple of minutes, he was able to struggle free, and he fled the area.  C.L. immediately reported the incident to his brother and his grandmother, who called 911. C.L. was upset and crying when he reported the incident.

The troopers located Lee in the same wooded area that C.L. identified as the scene of the assault.  The following day, Lee told the troopers that C.L. had

---

[1]  AS 11.41.436(a)(1).

approached her and propositioned her for sex, but that she turned him down and walked away without having any physical or sexual contact with him.

Based on C.L.'s account, Lee was indicted on charges of kidnapping, first-degree sexual assault, and second-degree sexual abuse of a minor.[2]

As part of the law enforcement investigation into the allegations against Lee, a forensic nurse collected six swabs from C.L.'s penis; these swabs were sent to the Alaska Scientific Crime Detection Laboratory (crime lab) for DNA testing. (The nurse also collected two scrotum swabs from C.L. and fingernail scrapings from C.L. However, neither the State nor the defense ever tested these items.)

*The crime lab's DNA testing of the six penile swabs and the resulting litigation*

A forensic analyst from the crime lab, Sara Graziano, was tasked with performing DNA testing on the penile swabs collected from C.L. Graziano knew that the crime lab had a low success rate — only 37.5% — in obtaining interpretable DNA from penile swabs. Graziano was also under the mistaken impression that C.L. had not ejaculated.[3]

Graziano noted that C.L.'s evidence kit contained an unusual number of penile swabs — six — as compared to the two swabs that are typically collected. This posed such an "unorthodox" scenario that Graziano stopped her analysis to confer with her supervisor.

Ultimately, in an effort to "maximize the total DNA from all of the swab material," Graziano and her supervisor decided that she should place all of the biological

---

[2] AS 11.41.300(a)(1)(C), AS 11.41.410(a)(1), and AS 11.41.436(a)(1), respectively.

[3] At trial, C.L. testified that he ejaculated. He further testified that he had not told anyone this information during the investigation because no one had directly asked him.

material from each of the swabs into two tubes for testing. As Graziano later explained, this seemed to provide the best chance of obtaining an interpretable DNA profile:

> *Graziano*: I used all the peripheral swab material because I thought that . . . was the best-case scenario at getting all of the DNA from all of the cells that were collected across all of the swabs. So the way I handled the evidence was I felt the best way to get DNA profile information.

Graziano proceeded to remove the peripheral material — *i.e.*, the external surface of the swabs most likely to contain bodily fluids — from all six penile swabs, placing the material from three swabs in one testing tube and the material from the other three swabs in a second tube. Graziano then extracted DNA from the material in both tubes. She preserved half of this DNA extract for later independent testing by Lee and used the other half of the extract to generate a DNA profile. Graziano used this profile to confirm the presence of Lee's DNA on C.L.'s penis. She issued a report detailing her findings on July 6, 2015.

Approximately six weeks later, Lee's attorney requested that certain items of evidence, including the penile swabs, be sent to the Serological Research Institute (SERI) for independent testing.[4]

Upon receiving the items, a SERI analyst attempted to test the penile swabs for the presence of an enzyme known as amylase — an enzyme present in a number of bodily fluids, including saliva. However, because all of the peripheral material containing bodily fluids had been removed during the DNA testing, the analyst was unable to confirm whether amylase had been present on C.L.'s penile swabs.

---

[4] On appeal, Lee asserts that her attorney informed the prosecutor in May that she wanted to independently test the penile swabs. But the record does not support this contention. Instead, the record contains two sworn affidavits from Lee's attorney stating that she did not notify the prosecutor of the defense's request for testing until August 17, 2015 — approximately six weeks after the crime lab had finished its testing and issued its report.

Based on the inability to test for amylase, Lee filed a motion to dismiss her indictment.[5] In the motion, Lee explained that her defense at trial would be that C.L. had fabricated the forced fellatio allegations to cover up his own non-consensual penile-vaginal penetration of Lee. Lee explained that she had sought the amylase testing in an attempt to prove the absence of saliva on C.L.'s penis. If the testing showed that there was no amylase on C.L.'s penile swabs, Lee intended to argue that the absence of amylase meant that there was an absence of saliva on the penis, which could mean that the sexual intercourse had been vaginal, not oral, and that C.L. had lied about the fellatio. According to Lee, the State's failure to preserve the original biological material on the penile swabs prevented her from conducting her desired amylase test, and the State's consumption of this material in the DNA testing process therefore violated her due process right to present a defense. Lee also argued that the State's failure to preserve the original biological material on the swabs constituted a violation of the State's evidence-preservation duties under AS 12.36.200(a)(2).[6]

The court held an evidentiary hearing on Lee's motion to dismiss. Graziano was the only witness at the evidentiary hearing. Graziano testified that she had consulted with her supervisor before using all six penile swabs. She testified that it was very difficult to obtain DNA profiles from penile swabs, and that, in her view, the best use of

[5] Lee also moved, in the alternative, to suppress the State's DNA results. But she later withdrew her request for suppression. Instead, she requested that, if the motion to dismiss was not granted, the jury should be given a favorable presumption instruction under *Thorne v. Dep't of Pub. Safety* — that is, the jury should be instructed to presume that any testing of the non-DNA biological evidence on the penile swabs would have been favorable to the defense if it had been preserved by the State. *Thorne v. Dep't of Pub. Safety*, 774 P.2d 1326, 1330-31 (Alaska 1989).

[6] Alaska Statute 12.36.200(a)(2) requires the State to preserve "biological evidence in an amount and manner that is sufficient to develop a DNA profile" in cases where a person has been convicted of, or adjudicated a delinquent for, certain crimes against a person.

the evidence was "[t]o consume the swab material and generate the DNA profiles while retaining half of the DNA extract in case anyone downstream would like to utilize that."

Graziano further testified that the state crime lab does not test for the presence of saliva (amylase) because such tests are not currently "confirmatory" and often result in false positives. Graziano explained that amylase is found in many other bodily fluids besides saliva, including vaginal secretion and perspiration, and, as a result, analysts would be unable to unequivocally say that the amylase came from saliva. Thus, Graziano concluded that "even if there was a positive saliva result on the front end, even SERI couldn't say if that was from mouth contact confirmatorily [sic] or from vaginal [contact] because vaginal fluids also cross-react with the saliva test."

Graziano also testified that the absence of amylase in a sample was not particularly meaningful scientifically because it just meant that the particular sample did not contain amylase, not that there was no amylase on the penis. As she stated, "the absence of evidence . . . is not the evidence of absence."

Following the evidentiary hearing, the trial court denied Lee's motion to dismiss. The court concluded that AS 12.36.200(a)(2) required only that the State preserve biological evidence "in an amount and manner that is sufficient to develop a DNA profile" — a duty Graziano fulfilled by preserving half of the DNA extract. The court also found no due process violation because Graziano had not acted in bad faith, and she had followed the crime lab's internal operating procedures. The court also ultimately denied Lee's alternative request to instruct the jury, under *Thorne v. Department of Public Safety*,[7] to presume that if the biological material had been preserved, it would have resulted in forensic testing that was "favorable" to the defense.

---

[7]    *See Thorne*, 774 P.2d at 1331-32.

*Lee's trial*

At trial, C.L. testified and Lee's defense attorney attacked his credibility, arguing that he was lying. The attorney claimed that C.L. had sexually assaulted Lee vaginally, and that Lee was the victim in this case, not C.L. Lee did not testify.

The parties heavily litigated the question of whether the State had destroyed potentially favorable defense evidence when it consumed the biological material from the six penile swabs that were DNA tested.

Graziano testified for the State. In her testimony, she detailed the steps she had taken to test the evidence for DNA. Lee's defense attorney extensively cross-examined Graziano regarding the reasons why she consumed all six penile swabs in her DNA testing, and why she did not test the penile swabs for the presence of amylase. Graziano testified, consistently with her evidentiary hearing testimony, that she had used the six penile swabs because she believed it was the best chance to get a DNA result, given the difficulty of obtaining DNA results from penile swabs. Graziano also testified that the crime lab does not test for saliva because there are currently no confirmatory tests for saliva and amylase can be found in other bodily secretions, including vaginal fluid and perspiration.

To rebut this testimony, the defense attorney called Angela Butler, a forensic analyst from SERI. Butler testified that SERI analysts *are* able to accurately detect saliva in samples, using both presumptive and confirmatory tests. According to Butler, SERI analysts are able to detect the presence of saliva in a sample by analyzing the presence of a specific enzyme, amylase type 1, which is highly concentrated in saliva. However, Butler was unable to test the penile swabs for the presence of amylase type 1, because the biological material from the swabs had been consumed as part of the crime lab's DNA testing.

Butler testified that she did test two cuttings from Lee's black pants for saliva and semen. The sample from the upper-right-leg area tested "weak positive" for amylase type 1, indicating the presence of a low level of saliva. Testing did not reveal the source of the saliva. The same area tested "weak positive" for the presence of semen, and the analyst was able to determine C.L. was the only detectable contributor. Butler also testified that she tested the upper-right-leg cutting for epithelial (skin surface and body cavity) cells, finding two contributors. C.L. was confirmed as a contributor, but there were insufficient cells to discern the identity of the second contributor. The sample from the interior-crotch area of Lee's pants tested negative for both semen and saliva.

The defense attorney highlighted Butler's testimony during closing arguments. The attorney asserted that the jury was not getting the "whole story" and that they could have "gotten more [of] the story" if Graziano had not consumed all six penile swabs as part of the DNA testing. The attorney emphasized that Butler worked for an independent crime lab and did not work exclusively for law enforcement as the state crime lab analyst did, and the attorney argued that there was no need for the State to consume all six swabs. The defense attorney also highlighted various inconsistencies in C.L.'s testimony, and she argued that C.L. had not initially admitted to ejaculating because he did not want to look guilty.

In response, the State argued that C.L.'s testimony was credible and pointed to Lee's statement to the police that showed that she knew C.L. was under sixteen years old.

Following deliberations, the jury convicted Lee of second-degree sexual abuse of a minor for engaging in sexual penetration with a fourteen-year-old child.[8] The jury acquitted Lee of kidnapping and first-degree sexual assault.

---

8    Sexual penetration includes fellatio under Alaska law. *See* AS 11.81.900(b)(62).

This appeal followed.

*Lee's arguments on appeal*

On appeal, Lee argues that the State's consumption of the six penile swabs violated AS 12.36.200, the statute that requires the State to preserve biological evidence for DNA testing in certain types of cases. Lee also argues that the State's consumption of the six penile swabs violated her due process rights and precluded her from developing and presenting her defense.

Lee asserts that the proper remedy for these violations was dismissal of the charges, and that the trial court therefore erred when it denied her motion to dismiss. In a single paragraph, Lee also argues, in the alternative, that the trial court should have given the jury a favorable presumption instruction under *Thorne*.

*Lee's argument that Graziano's actions violated AS 12.36.200*

In 2010, the Alaska legislature passed AS 12.36.200, a statute addressing the preservation of biological material in murder and sexual assault cases. The sponsor of the legislation, Senator Hollis French, explained that the primary purpose of the legislation was to ensure that the State preserved the biological evidence in these cases so that it would be available for post-conviction DNA testing.[9]

The statute requires the State to preserve "biological evidence in an amount and manner that is sufficient to develop a DNA profile" for as long as the person

---

[9] *See* Minutes of Senate Finance Comm., Senate Bill 110, testimony of Senator Hollis French, 9:29:13-9:33:30 a.m. (Apr. 13, 2009).

convicted of the offense remains in custody or is subject to registration as a sex offender.[10] Biological evidence is defined as including:

    (A)   the contents of a sexual assault forensic examination kit;

    (B)   semen, blood, hair, saliva, skin tissue, fingernail scrapings, bone, bodily fluids, or other identifiable human bodily material collected as part of a criminal investigation;

    (C)   a slide, swab or test tube containing material described in (B) of this paragraph; and

    (D)   swabs or cuttings from items that contain material described in (B) of this section.[11]

If the State intends to destroy the biological evidence while the person remains a prisoner in the custody of the Department of Corrections or while the person remains subject to registration as a sex offender, the State must provide notice to the defendant, the defense attorney of record, the Public Defender Agency, and the district attorney responsible for prosecuting the crime.[12] Any of these people can request testing of the evidence or continued preservation of the evidence.[13] The State is then prohibited from destroying the evidence unless a court finds no reason for its continued preservation.[14]

---

[10] AS 12.36.200(a)(2). The statute also requires the State to preserve "all evidence" in unsolved murder and sexual assault cases "for the period of time that the crime remains unsolved or 50 years, whichever ends first." AS 12.36.200(a)(1).

[11] AS 12.36.200(i)(2).

[12] AS 12.36.200(d)(2).

[13] AS 12.36.200(d)(3). The request must be filed within 120 days of the received notice. *Id.*

[14] AS 12.36.200(e) (allowing courts to grant an agency's petition to destroy evidence "if the court finds the request [for continued preservation] is without merit or that the evidence

(continued...)

If the State destroys evidence in violation of the requirements of AS 12.36.200, "the court may order remedies the court determines to be appropriate."[15]

In the trial court proceedings, Lee argued that the State had violated AS 12.36.200 by consuming the biological material on the six penile swabs. She also asserted that dismissal of the charges was the appropriate remedy.

The trial court disagreed. The court noted that AS 12.36.200(a)(2) has a "DNA profile focus," and the court found it significant that the statute only required that the State preserve biological evidence "in an amount and manner that is sufficient to develop a DNA profile." The court found that this had been accomplished in Lee's case because Graziano had preserved a portion of the DNA extract for any future independent DNA testing.

Lee now appeals that ruling.

The proper interpretation of a statute is a question of law that we review *de novo*.[16] We interpret statutes "according to reason, practicality, and common sense, considering the meaning of the statute's language, its legislative history, and its purpose."[17] Alaska courts use a sliding scale approach to statutory interpretation: "[T]he

---

[14] (...continued)
has no significant value for biological material").

[15] AS 12.36.200(g). However, an unintentional violation of the statute does not constitute grounds to file a civil lawsuit. AS 12.36.200(h).

[16] *Hillman v. State*, 382 P.3d 1198, 1200 (Alaska App. 2016); *see*, *e.g.*, *Ward v. State, Dep't of Pub. Safety*, 288 P.3d 94, 98 (Alaska 2012) (interpreting AS 12.63.020).

[17] *Murphy v. Fairbanks N. Star Borough*, 494 P.3d 556, 563 (Alaska 2021) (quoting *Vandenberg v. State, Dep't of Health & Soc. Servs.*, 371 P.3d 602, 606 (Alaska 2016)); *see also Baer v. State*, __ P.3d __, Op. No. 2709, 2021 WL 4487894, at *2 (Alaska App. Oct. 1, 2021).

plainer the language of the statute, the more convincing contrary legislative history must be."[18]

Lee argues that the State violated AS 12.36.200(a) when Graziano used all of the biological material on the penile swabs to create the DNA extract, even though a portion of the DNA extract was preserved for any future independent DNA testing the defense might want to perform. According to Lee, Graziano was required to preserve some of the available biological material so that the material would be available for *any* type of forensic testing that the defense wanted to perform.

We agree, as a general matter, with the principle that, if the State's forensic testing will consume all of the available material to be tested, then the defense should be notified. We also note that failure to notify may create due process issues in certain circumstances. But we disagree with Lee's contention that the State's actions violated AS 12.36.200(a).

As the trial court found, the specific focus of AS 12.36.200(a) is the preservation of biological material for DNA testing. The statute requires that biological material be preserved "in an amount and manner that is sufficient to develop a DNA profile."[19] Here, Graziano preserved evidence from the swabs "in an amount and manner" sufficient to allow Lee to develop an independent DNA profile.[20] This is all the plain language of the statute required.

---

[18] *Ward*, 288 P.3d at 98 (citation omitted); *see Hillman*, 382 P.3d at 1200.

[19] AS 12.36.200(a)(2); *see also* AS 12.36.200(i)(2) (defining biological evidence).

[20] *See* AS 12.36.200(a)(2).

The legislative history of the statute supports this plain meaning.[21]  Prior to enacting AS 12.36.200(a)(2), the legislature heard testimony from multiple witnesses, including representatives of the Alaska Innocence Project.  The Alaska Innocence Project representatives advocated for preservation requirements beyond the "narrow category" of DNA-related evidence on the theory that future technological advancements might allow for a broader range of testing of non-DNA biological material.[22]  The Innocence Project representatives further advocated for the bill's language to require the preservation of "items containing biological evidence."[23]  With this change, the Innocence Project representatives hoped to clarify that the items to be preserved are "evidentiary items and not just test tubes and things like that."[24]

But after hearing this testimony, the legislature chose not to change the language or expand the scope of AS 12.36.200, instead maintaining the statute's focus

[21]  *See Chinuhuk v. State*, 472 P.3d 511, 515 (Alaska 2020) (noting that when interpreting a statute, we do not "mechanically apply the plain meaning rule, using instead a sliding scale approach to statutory interpretation, in which 'the plainer the statutory language is, the more convincing the evidence of contrary legislative purpose or intent must be'" (quoting *Adamson v. Anchorage*, 333 P.3d 5, 11 (Alaska 2014) (additional citations omitted))).

[22]  *See* Minutes of Senate Judiciary Comm., Senate Bill 110, testimony of Bill Oberly, Barbara Brink, Rich Norgard, Alaska Innocence Project and Rebecca Brown, Innocence Project (Feb. 25, 2009).

[23]  Minutes of Senate Judiciary Comm., Senate Bill 110, testimony of Richard Norgard, Board President, Alaska Innocence Project, 2:14:32-2:17:47 p.m. (Feb. 25, 2009).

[24]  Minutes of Senate Judiciary Comm., Senate Bill 110, testimony of Bill Oberly, Executive Director, Alaska Innocence Project, 1:59:19-2:03:21 p.m. (Feb. 25, 2009); *see also* Written Testimony of Rebecca Brown, Policy Analyst, Innocence Project, S.B. 110, Senate Judiciary Committee File, at 1553-54 (Feb. 25, 2009).

on DNA-related evidence.[25]  Thus, while there may be good reasons for requiring the State to preserve non-DNA biological evidence — reasons that may become even more evident as forensic testing methods continue to advance — the statute the legislature enacted in AS 12.36.200 does not impose these additional obligations.

Accordingly, we conclude that the State complied with AS 12.36.200(a)(2) when it preserved biological material collected from C.L. in an amount and manner sufficient to allow for independent DNA testing.

*Lee's argument that consumption of the penile swabs violated her right to due process under the federal constitution*

Lee next argues that even if the State's failure to preserve the peripheral material from the penile swabs did not violate AS 12.36.200(a)(2), it nevertheless violated her right to due process under the federal constitution.

Under federal due process jurisprudence, the State's failure to preserve potentially useful evidence does not constitute a denial of due process "unless a criminal defendant can show bad faith on the part of the [State]."[26]

Lee has not shown bad faith on the part of the State.  Indeed, at oral argument, Lee's attorney disavowed any claim of bad faith.  Accordingly, Lee has failed to establish a violation of her federal due process rights.

---

[25]  *See* H.C.S. C.S.S.B. 110, 26th Leg., 2d. Sess. (as passed by Senate, Apr. 16, 2010).

[26]  *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).

*Lee's argument that consumption of the penile swabs violated her right to due process under the state constitution*

Unlike the federal constitution, the Alaska Constitution does not require a finding of bad faith in order to establish a due process violation.[27] However, Alaska law does differentiate between circumstances where the State destroys evidence it should have preserved and circumstances where the State consumes evidence through forensic testing.[28]

The Alaska Supreme Court first addressed the State's consumption of evidence during forensic testing in *Lee v. State*.[29] The defendant in *Lee* was arrested with four balloons in his pocket, three of which contained a white powder residue.[30] The State performed a chemical analysis on the residue from one of the balloons, and determined it to be heroin. In conducting this analysis, however, the State's testing consumed the entirety of the residue found in the selected balloon.

On appeal, the supreme court rejected the argument that the State's consumption of the residue violated the defendant's due process rights. As the court explained, "[i]n those cases where expert analysis exhausts the substance there is clearly no error in the admission of evidence regarding the analysis in the absence of allegations and proof of deliberate destruction, or deliberate attempts to avoid discovery of evidence beneficial to the defense."[31] The court further noted that under the facts of the case, the

---

[27] *Thorne v. Dep't of Pub. Safety*, 774 P.2d 1326, 1330 & n.9 (Alaska 1989).

[28] *Compare Lauderdale v. State*, 548 P.2d 376, 381-82 (Alaska 1976), *and Thorne*, 774 P.2d at 1330, *with Lee v. State*, 511 P.2d 1076, 1077 (Alaska 1973).

[29] *Lee*, 511 P.2d at 1076.

[30] *Id.* at 1077.

[31] *Id.*

defendant was not left without recourse because, even without the ability to test the residue that the State had consumed, the defendant could have challenged the State's evidence by conducting his own examination of the residue on the remaining balloons.[32]

The supreme court distinguished *Lee* in *Lauderdale v. State*.[33] Instead of the consumption of evidence during testing, *Lauderdale* involved the State's negligent failure to preserve breath test ampoules in a prosecution for driving under the influence.[34] Unlike *Lee*, the ampoules were not "'exhausted' by any state analysis — they simply ha[d] been destroyed."[35] The supreme court held that the defendant's due process rights were violated by the destruction of the ampoules, and the court upheld the trial court's decision to suppress the results of the breath test.[36]

In her briefings, Lee argues her case is governed by *Lauderdale* rather than *Lee*.[37] Lee asserts that her case is distinguishable from *Lee* because Graziano received an "unorthodox" abundance of testable material, *i.e.*, six penile swabs rather than the typical two. According to Lee, Graziano acted unreasonably when she consumed all six penile swabs, and her failure to preserve some of the swabs for later amylase testing

---

[32]    *Id.* at 1078.

[33]    *Lauderdale v. State*, 548 P.2d 376, 382 (Alaska 1976).

[34]    *Id.* at 378.

[35]    *Id.* at 382.

[36]    *Id.* at 381; *see also Thorne v. Dep't of Pub. Safety*, 774 P.2d 1326, 1330-31 (Alaska 1989) (holding that the State's destruction of a videotape showing the defendant's performance on field sobriety tests violated due process).

[37]    *See Harmon v. State*, 908 P.2d 434, 443-44 (Alaska App. 1995) (distinguishing between the destruction and consumption lines of cases, and concluding that *Lauderdale* and *Thorne* did not apply when the State exhausted the evidence during testing), *abrogated on other grounds by State v. Coon*, 974 P.2d 386 (Alaska 1999).

violated Lee's due process rights. Lee also argues that her case is distinguishable from *Lee* because, unlike in *Lee*, she was left without other evidence to test.

But this is not strictly true. There was other evidence that Lee could have tested for the presence or absence of amylase — namely, Lee's pants and the scrotum swabs. In fact, Lee did test the pants and discovered amylase type 1, the form found in saliva. Lee did not test any of the scrotum swabs for amylase, and she provided no explanation for her failure to do so.

At oral argument, Lee changed course and argued *Lee* in fact governed her case and that the trial court needed to make a finding about whether the consumption of evidence was "necessary."[38] Without that finding, Lee argued that the total consumption of evidence was a violation of due process and the trial court should have dismissed her case. But Lee did not explicitly request such a finding in the trial court, and we agree with the State that she has therefore waived her argument that the trial court was required to find that the consumption of evidence was "necessary." Instead, we address the findings that the trial court did make — which was that Graziano acted reasonably, given the information she knew at the time of the testing.

Lee argues that Graziano might have been able to preserve some of the swabs if she had employed incremental testing — initially testing a smaller number of swabs, and then performing additional testing on the remaining swabs only if the initial tests did not result in a usable DNA profile. But Graziano testified that she and her supervisor had good reasons for rejecting that approach. At the evidentiary hearing, Graziano stated that her goal was to maximize the usable DNA extracted from the penile

---

[38]   *See Lee v. State*, 511 P.2d 1076 (Alaska 1973).

swabs and minimize any loss of biological material.[39]  She explained that using some, or only parts, of the swabs risked missing the portions that contained the testable evidence.

Importantly, Graziano had no reason to believe that the penile swabs had any evidentiary value beyond the DNA profiles that could potentially be obtained from them.  At the time of the DNA testing, C.L. had accused Lee of performing fellatio on him and Lee had not made any statements alleging she was in fact the victim.  The State did not learn of the defense's theory that C.L. had vaginally raped Lee until much later, after the DNA testing had already occurred and the penile swabs had been consumed.

Moreover, Graziano had little reason to believe that there were any tests other than DNA testing that the defense would want to be conducted on this evidence.  As Graziano testified, the crime lab did not conduct saliva tests because it did not consider them confirmatory since amylase can be found in other bodily secretions, including vaginal secretions.

At trial, the defense produced an expert who testified that a saliva test *could* be confirmatory because there is a particular enzyme — amylase type 1 — that is present in higher concentrations in saliva than in other bodily fluids, such as vaginal secretions.  But, even assuming that is true, it is not clear how the defense was meaningfully prejudiced by the inability to conduct such a test.  A confirmatory test could have shown the presence of amylase type 1 on C.L.'s penis, which would have supported the State's case and undermined the defense.  But the *absence* of amylase type 1 on a particular

---

[39]  *Cf. United States v. Anderson*, 169 F.Supp.3d 60, 68 (D.D.C. 2016) (quoting a forensic testing expert who explained the dangers of incremental testing:  "While it is unknown exactly how much DNA is lost, by essentially testing the sample twice, you risk losing twice as much DNA than would have been lost had the entire sample been consumed at the outset.  Since it is not clear whether a percentage of DNA or a particular amount of DNA . . . is lost, this is a particularly risky policy for samples that are expected to have low levels of DNA."  (alteration in original)).

penile swab would not have similar evidentiary value. At most, it would have shown that saliva was not on the particular penile swab that was tested, but it could not have shown that saliva was not on C.L.'s penis at all.

Thus, given the trial court's well-supported finding that the State acted reasonably given the information it had at the time of testing, and given that the consumed evidence was of questionable evidentiary value to the defense, we conclude that the trial court did not err when it ruled that Lee's due process rights were not violated and her ability to present her defense was not impaired.

*A final note: the State should give notice to the defense before consuming forensic or biological evidence*

Although we do not find a due process violation in this case, we emphasize that this does not mean that we would not find a due process violation in a different case with different circumstances and facts.

Several jurisdictions have noted that, even if not required by due process, it is "better practice" for the State to give notice to a defendant before undertaking testing that will consume evidence.[40] Indeed, the ABA's Standards for Criminal Justice require an analyst to obtain permission from a prosecutor prior to undertaking testing that will entirely consume either "DNA evidence or the extract from it" — and require the

---

[40] *See, e.g.*, *State v. Carlson*, 267 N.W.2d 170, 175 & n.4 (Minn. 1978) (adopting the Alaska Supreme Court's holding in *Lee*, but observing that "when chemical analysis may require the total exhaustion of the available physical evidence, better practice would dictate that the defendant be notified of the proposed testing so that the defendant's own expert can be present, if so desired") (citing *Lee v. State*, 511 P.2d 1076, 1077 (Alaska 1973)); *State v. Herrera*, 365 So. 2d 399, 401 (Fla. App. 1978) ("[I]t would be better practice, although not constitutionally mandated, for the state to delay the testing of minuscule quantities of suspect drugs in a drug prosecution until the defendant or his representative has been given a fair opportunity to be present during such testing.").

prosecutor to provide notice and an opportunity to object to "any defendant against whom an accusatorial instrument has been filed, or any suspect who has requested prior notice."[41]

At least one state has gone even further. In *State v. Gaddis*, the Supreme Court of Tennessee concluded that whenever evidence will be "destroyed, exhausted or consumed" by State testing, "good faith demands that no test or analysis be made except by agreement between the District Attorney and defense counsel, or until such time as defense counsel may arrange to have his own expert present at the test."[42]

We note that, in this case, the State did not follow this better practice. The crime lab's written policies, both those in effect at the time Graziano performed her testing and those currently in effect, expressly approve the consumption of evidence during DNA testing, as long as half of the DNA *extract*, but not the original biological evidence itself, is preserved.[43] This practice is in contravention of the ABA Standards

[41]  *ABA Standards for Criminal Justice* § 16-3.4 (3d ed. 2007).

[42]  *State v. Gaddis*, 530 S.W.2d 64, 69 (Tenn. 1975).

[43]  *See* Alaska Scientific Crime Detection Laboratory, *Forensic Biology Procedure Manual* 16, 20 (May 10, 2021), https://dps.alaska.gov/getmedia/5cf46f15-5823-43c8-881c-cce7e3deafd3/FBPM-2021-R1 (describing current policy as of May 2021 to preserve "half the extract . . . unless written permission from the Department of Law for consumption" has been obtained and acknowledging that testing samples may "consume all the swab material"); Alaska Scientific Crime Detection Laboratory, *Forensic Biology Casework Procedures* 14, 20 (Dec. 2, 2014), https://dps.alaska.gov/getmedia/1bf8db93-d2ed-48b6-b1be-a6edd926861d/FBCP-2014-R1-archived-6-29-2015 (explaining policy in effect between December 2014 and June 2015 required half the extract to be retained "unless written permission for consumption of the sample has been obtained").

for Criminal Justice requirement to provide a defendant notice and an opportunity to object before consuming *either* "DNA evidence or the extract from it."[44]

While we agree with the trial court that no due process violation occurred under the specific facts of this case, we also believe that it is better practice for the State to provide notice to an indicted defendant before destroying, exhausting, or consuming biological evidence. The failure to do so could amount to a due process violation if the consumption hindered the defendant's ability to present a defense.[45] Following notification, a defendant and their counsel can then elect whether to submit a written request to the court for the continued preservation of evidence or whether to have their own expert present at the time of testing.

*Conclusion*

For the reasons explained in this opinion, we AFFIRM the judgment of the superior court.

---

[44] *ABA Standards for Criminal Justice* § 16-3.4 (3d ed. 2007).

[45] *See Smithart v. State*, 988 P.2d 583, 586 (Alaska 1999) (recognizing that, although not absolute, "a defendant's right to present a defense is a fundamental element of due process"); *cf. Herrera*, 365 So. 2d at 401 (observing that, even in the absence of a due process violation, the State's failure to notify a defendant prior to the consumption of evidence during testing would leave the credibility of the analyst "open to question before a trier of fact").